# UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re

**WHIZ KIDS DEVELOPMENT, LLC**,                    Chapter 7
                                                  Case No. 15-13167-JNF

       Debtor

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**PETER A. HEANEY**,
       Plaintiff,
v.                                                Adv. P. No. 16-1177

**EUGENE M. LAMENTO**,
       Defendant

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

## I. INTRODUCTION

The matter before the Court is the four-count Complaint (the "Complaint") filed on October 18, 2016 by Peter A. Heaney ("Heaney"), who purchased the real property located at 2 Ionic Avenue, Worcester, Massachusetts (the "property"). Heaney purchased the property from the Chapter 11 debtor, Whiz Kids Development, LLC ("Whiz Kids" or the "Debtor"), prior to conversion of the Debtor's case to one under Chapter 7, which sale was approved by this Court. Through the Complaint, Heaney seeks damages, including attorney's fees and injunctive relief against the defendant, Eugene M. Lamento ("Lamento"), for violation of the automatic stay pursuant to 11 U.S.C. § 362 (Count I) and this Court's Order dated October 29, 2015 approving the sale of the property to Heaney free and clear of all interests pursuant to 11 U.S.C. § 363(f) (Count II). The Complaint also contains a count for Slander of Title (Count III) and Defamation (Count IV) based upon

1

statements made by Lamento concerning Heaney and his interest in the property following the sale.  The Court conducted a trial on Counts I and II of the Complaint on August 7, 2017, and the parties thereafter filed their post-trial briefs.

The Court has jurisdiction over the dispute set forth in Counts I and II of the Complaint pursuant to 28 U.S.C. § 1334(a) and (b) and the order of reference from the United States District Court for the District of Massachusetts, as discussed further below. Such counts are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(G) and (N).  The Court does not have jurisdiction over Counts III and IV of the Complaint and dismisses such counts, as discussed in further detail below.

The Court now makes the following findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052.  For the reasons set forth below, the Court finds that Heaney has sustained his burden of proving that Lamento willfully violated this Court's order approving the sale of the property to Heaney, and that he is entitled to compensatory damages, including attorney's fees for prosecuting this adversary proceeding, as well as injunctive relief under Count II of the Complaint.  The Court finds, however, that Heaney has not established a violation of the automatic stay pursuant to 11 U.S.C. § 362 under Count I of the Complaint.

## II. FACTS AND PROCEDURAL BACKGROUND[1]

A. The Property

On September 7, 2011, Whiz Kids acquired the property by deed recorded at the Worcester District Registry of Deeds.  As discussed in further detail below, Whiz Kids failed to pay real estate taxes on the property, and the City of Worcester effected a tax taking of the property pursuant to Massachusetts law and later conveyed the taking to Lamento by a deed of the Treasurer and Collector of Taxes, dated June 10, 2015 (the "Collector's Deed").[2]

B. The Debtor's Bankruptcy Filing

Two months following the issuance of the Collector's Deed to Lamento, on August 11, 2015, Whiz Kids filed a voluntary petition under Chapter 11 of the Bankruptcy Code. James E. Levin ("Levin"), the Manager of Whiz Kids, signed the petition.  On the petition date, the Debtor filed its Schedules and Statement of Affairs.  On Schedule A – Real Property, the Debtor listed the property as being owned in fee simple, with a value of $20,000, subject to secured claims in the amount of $610,000 and described the nature of its interest:

> 2 Ionic Avenue, Worcester, MA - the market value of the debtor's property is difficult to determine. It is a derelict building that only has value as a teardown to someone seeking to develop the block in which the property is situated. The property is assessed by the City of Worcester at $620,000.00.

---

[1] The Court may take judicial notice of its own dockets. *See* LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.), 196 F.3d 1, 8 (1st Cir. 1999) ("The bankruptcy court appropriately took judicial notice of its own docket.").

[2] These facts are set forth as "Admitted or Undisputed Facts Which Require No Proof" in the Joint Pre-Trial Memorandum filed by the parties on April 21, 2017.

This figure is a fantasy. If a value had to be placed upon the debtor's property is would be in the vicinity of $20,000.00.

On Schedule D – Creditors Holding Secured Claims, the Debtor identified the following four entities as holders of secured claims on the property: 1) the City of Worcester as the holder of a lien in the amount of $350,000, presumably for real estate taxes, and as a holder of an "affordable housing restriction;" 2) the "MassDEP," as the holder of a "super priority lien" in the amount of $180,000; 3) First American Realty, Inc., as a "purchaser of a municipal tax lien" in the amount of $51,000; and 4) Lamento, as a "purchaser of a municipal tax lien" in the amount of $31,000.  Lamento was also listed on the matrix of creditors and was served by the Bankruptcy Noticing Center with the "Notice of Chapter 11 Bankruptcy Case, Meeting of Creditors, & Deadlines."

One day after the petition date, on August 12, 2015, the Debtor filed a Motion to Allow Private Sale of Real Estate, through which it sought to sell the property to Heaney for $107,000, pursuant to 11 U.S.C. § 363(b) and (f) which authorize a trustee, and thus a debtor in possession, *see* 11 U.S.C. § 1107, to sell property of the estate, other than in the ordinary course of business, free and clear of interests of third parties after notice and a hearing.  On August 14, 2015, pursuant to the Motion of the United States trustee, the Court dismissed the Debtor's case due to its failure to provide evidence of liability insurance on the property.  Six days later, on August 20, 2015, the Debtor filed a Motion for Reconsideration of the dismissal order and attached to the motion evidence of liability insurance for the property.  The Court allowed to the motion in the absence of any objections on September 4, 2015 and reinstated the Chapter 11 case.

C.  <u>The Sale Motion</u>

On September 16, 2015, the Debtor filed a Renewed Motion to Allow Private Sale

of Real Estate, again seeking to sell the property to Heaney, d/b/a On-Site Carpentry for

$107,000, pursuant to 11 U.S.C. § 363 (the "Sale Motion").  The Debtor stated its reason

for the sale:

> [T]he Debtor has gone as far as it can with the Property and it needs to be
> sold to someone or something that can develop it because the Debtor is no
> longer capable of doing so. . . .
> That in the months leading up to the filing of this Chapter 11, the Debtor
> has endeavored to arrange for the sale of the property, but the competing
> disparate interests have made that an exercise in futility.

The Sale Motion, which was served on Lamento and his then counsel, Attorney Henry J.

Lane ("Attorney Lane"), provided that the sale would be free and clear of all liens, claims,

interests, and encumbrances, with such interests to attach to the sale proceeds.  On

September 24, 2015, the Debtor filed a Notice of Intended Private Sale of Real Estate Free

and Clear of Liens, which was also served on Attorney Lane.  Also on September 24, 2015,

the Court issued a deadline of October 15, 2015 to submit higher offers or to object to the

Sale Motion.  *See* Docket Entry No. 40 in the bankruptcy case.

The filing of the Sale Motion generated a number of responses and objections from

interested parties as well as one higher offer.  On October 14, 2015, Worcester Capital

Corp. ("Worcester Capital") filed a Statement in Response to the Sale Motion in which it

identified itself as the holder of a tax title on the property.  Through its Response,

Worcester Capital asserted that it did not oppose the proposed sale provided that all liens

and encumbrances on or against the property attached to the proceeds of the sale, to the

same extent and priority they attached to the property.  A Notice of Higher Offer was filed by Worcester Properties, LLC ("Worcester Properties") on October 15, 2015, through which it offered to pay $110,000 for the property.

Objections to the Sale Motion were timely filed on October 15, 2015 by both the Massachusetts Department of Environmental Protection (the "MassDEP") and Lamento. In its Objection, the MassDEP asserted a super-priority lien on the property in the amount of $202,484 pursuant to Mass. Gen. Laws ch. 21E § 13, the Massachusetts environmental super-lien statute, for recovery costs associated with the remediation of a fuel leak originating from the property in 2011. The MassDEP requested that the full amount of all sale proceeds be paid to the Commonwealth of Massachusetts.

In Lamento's Objection to the Sale Motion, he asserted that the Debtor's proposed sale to Heaney was not in compliance with Massachusetts Local Bankruptcy Rules because the Debtor failed in the Sale Motion to describe its marketing efforts with respect to the property and to adequately explain why a private sale, as opposed to a public sale, was in the best interest of the estate.  He added that the proposed purchase price of $107,000, a fraction of the property's assessed value, was unreasonable.  He implied nefarious intent by the Debtor based upon the value it attributed to the property in Schedule A ($20,000) and the amount of secured claims against the property ($612,000). He further posited that the proposed sale, and the associated insurance, broker's commission, attorney's fees, and closing costs "looks like the latest move in a shell game" and suggested that the Debtor may attempt to recoup the expenses of sale through a "side agreement with the proposed buyer, after the property has been sold free and clear of all

6

liens."  In connection with his Objection, Lamento submitted a copy of the Collector's

Deed, dated June 10, 2015, which provided as follows:

[THIS DEED IS NOT VAID UNLESS RECORDED WITHIN 60 DAYS
AFTER THE DATE OF SALE]

_____

STATE TAX FORM 321                    TAX COLLECTOR'S DEED
                                       TO A PERSON
                                WHOLE ESTATE – NO ADJOURNMENT

THE COMMONWEALTH OF MASSACHUSETTS
CITY OF WORCESTER
OFFICE OF THE COLLECTOR OF TAXES

I, …, Treasurer & Collector of Taxes for the City of Worcester, pursuant and
subject to the provisions of General Laws, Chapter 60, §§ 43 and 45, in
consideration of $16,016.81/100 dollars to me paid, hereby grant to:
EUGENE M. LAMENTO, . . . subject to the statutory right of redemption,
[the property]  . . . NOW OR FORMERLY OWNED BY SAID WHIZ KIDS
DEVELOPMENT LLC …

**FY 14 TAXES UNPAID  $13,293.06**

No person having offered to take an undivided part of said land at a sale
by public auction as provided by law, the whole of said land was sold to
the grantee at said auction on **May 20, 2015,** for non-payment of taxes as
defined in § 43 of said Chapter 60 assessed thereon to: **WHIZ KIDS
DEVELOPMENT LLC** for the Fiscal Year **2014** which were not paid within
14 days after demand thereon was made . . . , and still remain unpaid at the
date of the sale in the above amount including interest and necessary
intervening charges after publication of notice of sale ….

This deed is given with the warranty that the aforesaid sale was in all
particulars conducted according to law.

Executed as a sealed instrument this 10th day of June, 2015

/s/Mariann Castelli Hier, Treasurer & Collector of Taxes -City of Worcester
. . .

7

As is clear from the Collector's Deed, Lamento received an interest in the property at an auction conducted on May 20, 2015 (the "Auction"), and such interest was expressly subject to the Debtor's statutory right of redemption and the provisions of Mass. Gen. Laws ch. 60, § 45, which, in relevant part, provides:

> The collector shall execute and deliver to the purchaser a deed of the land . . . [and t]he deed shall convey the land to the purchaser, subject to the right of redemption. The title thus conveyed shall, until redemption or until the right of redemption is foreclosed as hereinafter provided, be held as security for the repayment of the purchase price, with all intervening costs, terms imposed for redemption and charges, with interest thereon, . . . *No sale hereafter made shall give to the purchaser any right to possession of the land until the right of redemption is foreclosed, as hereinafter provided.*

Mass. Gen. Laws ch. 60, § 45. (emphasis added).   As provided in § 45 above, the Collector's Deed did not confer a possessory interest in the property on Lamento. Instead, he held title "merely as security for repayment of the purchase price, together with all intervening costs and terms imposed for redemption including charges with interest thereon," until redemption or foreclosure of the right of redemption. Jenney v. Tilden, 270 Mass. 92, 94, 169 N.E. 669, 670 (1930) (citing Mass. Gen. Laws ch. 60, § 45). In other words, Lamento held a lien on the property on the petition date, not a possessory interest.

D.  The Sale Hearing

On October 21, 2015, the Court conducted a hearing on the Sale Motion, the responses, objections, and the higher offer of Worcester Properties (the "Sale Hearing"). Lamento was represented at the hearing by Attorney Lane and also personally appeared at the hearing.  His counsel objected "to the entire bankruptcy proceeding," asserting that

Lamento was the title holder of the property and that "all the bankruptcy estate has in this case is a right of redemption." He elaborated: "We have no objection to that right of redemption being sold. We do object to the Court exercising jurisdiction and authorizing the sale of what we believe to be our property, which, is . . . only subject to the right of redemption." He added that the Debtor's right of redemption under state law would expire on November 20, 2015, a date six months from the date of the Auction.[3]

In light of Lamento's assertions that the proposed sale price was not reasonable, the Court permitted Lamento's counsel to examine the real estate broker employed by the Debtor, Jonathan Beasley ("Beasley"), at the Sale Hearing. Beasley testified that the property was in poor condition, partially "gutted" and in need of extensive interior work. He opined that the value of the property was between $107,000 and $130,000. Lamento's counsel insisted at the hearing, without supporting evidence, that the property had a higher value than the offers made by Heaney and Worcester Properties, and requested 21 days to inspect the property to make a counteroffer. The Debtor's attorney observed that the offers of Heaney and Worcester Properties were cash offers with no contingencies.

Following the arguments made by the parties, the Court overruled Lamento's Objection to the Sale Motion, ruling that, notwithstanding the tax title rights of Lamento and Worcester Capital, the Debtor's right of redemption had not been extinguished and,

---

[3] *See* Mass. Gen. Laws ch. 60, § 65 ("Except as provided in section sixty-two, whoever then holds the title to land acquired by a sale or taking for taxes may bring a petition in the land court for the foreclosure of all rights of redemption of said land . . . after six months from the sale or taking . . . .").

therefore, the property was still property of the bankruptcy estate pursuant to 11 U.S.C.

§ 541, which could be sold pursuant to 11 U.S.C. § 363, citing United States v. Whiting

Pools, 462 U.S. 198, 103 S. Ct. 2309 (1983).   The Court expressly rejected Lamento's

contention that the sale was not legitimate, observing that the purchase offer was

submitted through a broker and Lamento presented no evidence of any insider dealing

or a "shell game," as he characterized it.   The Court found the offer price set forth in the

Sale Motion was fair and reasonable based upon the testimony of the broker concerning

the marketing efforts and the poor condition of the property.   The Court resolved the

objections of the MassDEP and Worcester Capital, ruling that the sale was permissible

under 11 U.S.C. § 363(f)(5),[4] as those entities could be compelled, in a legal or equitable

proceeding, to accept a money satisfaction of their interests, and that their liens would

attach to the proceeds of the sale in order of their priority under applicable non-

bankruptcy law.

The Court thereafter conducted a sealed bid auction at the Sale Hearing at which

two final bids were submitted.   Lamento did not submit a qualifying counteroffer.   The

successful bidder was Douglas Kinan in the amount of $130,000 as Worcester Properties

---

[4] A trustee may sell property of a bankruptcy estate free and clear of interests in certain
circumstances. 11 U.S.C. § 363(f).  Section 363(f)(5) permits a trustee to sell property free
and clear of liens and interests if "such [lien or interest holder] could be compelled, in a
legal or equitable proceeding, to accept a money satisfaction of such interest." 11 U.S.C.
§ 363(f)(5). See also In re Healthco Int'l, Inc., 174 B.R. 174 (Bankr. D. Mass. 1994) (because
secured creditor with lien could be compelled to accept less than the full amount of its
debt over its objection in the context of confirmation of a Chapter 11 plan, it could be
compelled in a sale free and clear of its interest to accept less than the full amount of its
debt under § 363(f)(5)).

bid only $120,000 for the property. The Court directed Kinan to close the sale by November 13, 2015, failing which Worcester Properties would be authorized to purchase the property for $120,000.

Immediately following the conclusion of the Sale Hearing, upon the Court's further review of the Sale Motion, the Court became aware that the successful bidder identified at the hearing, namely Mr. Kinan, was not the party named as the original offeror in Sale Motion, namely Heaney. Accordingly, the Court directed counsel for the Debtor and Worcester Properties and Mr. Kinan to appear at a status conference on October 23, 2015 to enable the Court to determine the qualifications of the successful bidder. The Debtor then filed an "Emergency Statement" clarifying that Heaney was not available to attend the October 21, 2015 Sale Hearing and that he had authorized his associate, Mr. Kinan, to appear and act on his behalf at that Sale Hearing. Heaney testified at the October 23, 2015 status conference that he was the actual bidder for the property and that he had authorized Mr. Kinan, as his agent, to submit the final bid that was accepted at the sale hearing. Based upon this testimony, the Court found that Mr. Kinan was authorized as Heaney's attorney-in-fact at the Sale Hearing to submit a bid and confirmed that Heaney, d/b/a On-Site Carpentry, was the purchaser.

E.  The Sale Order

On October 29, 2015, the Court entered an order (the "Sale Order"), in a form submitted by the Debtor, authorizing it to sell the property to Heaney, d/b/a On-Site Carpentry, free and clear of all liens, claims, encumbrances and interests, with the same to attach to the sale proceeds in the priority to which they were entitled under

11

nonbankruptcy law, pursuant to 11 U.S.C. § 363, for $130,000, on the condition that the

closing occur by November 13, 2015, or a sale to Worcester properties would take place.

The Sale Order further provided, in pertinent part, the following:

> 7.   All objections to the Sale Motion and the Notice of Sale have been
> resolved and/or withdrawn, and to the extent any such objection was not
> otherwise withdrawn, waived or settled, it is overruled and denied. *All
> persons and entities holding liens, claims, encumbrances or interests in or against
> the property or in any way relating to the property are hereby forever barred,
> estopped and permanently enjoined from asserting against the property and
> Heaney, such persons' or entities' liens, claims, encumbrances or interests in and
> to the Property.*
>
> ***
>
> 11. This Order shall be effective and enforceable immediately upon entry,
> and its provisions shall be self-executing.  The fourteen (14) day stay
> provided in Bankruptcy Rule 6004(h) is enforce [sic].  This Court shall retain
> jurisdiction to interpret and enforce the provisions of this Order  . . . and
> further to hear and determine any and all disputes between the Debtor,
> Heaney … and any non-debtor party to any relevant agreement, . . . .

(emphasis added).

As is clear from the above quoted language of paragraph 7, all objections had been

resolved or overruled, and the Sale Order contained injunctive provisions enjoining all

interest holders from asserting their interests against the property and Heaney.  The Sale

Order was served by the Bankruptcy Noticing Center on Attorney Lane.[5]

F.   <u>The Appeal and the Motion to Reconsider the Sale Order</u>

Less than two weeks after the entry of the Sale Order, on November 10, 2015,

Lamento, *pro se*, filed both a Notice of Appeal of the Sale Order (the "BAP Appeal") with

---

[5] Attorney Lane did not appear for Lamento in the bankruptcy case or the adversary
proceeding following the Sale Hearing, but never filed a notice of withdrawal of his
appearance.

the United States Bankruptcy Appellate Panel for the First Circuit (the "BAP") and a

Motion to Alter or Amend the Sale Order with this Court pursuant to Fed. R. Civ. P. 59(e),

made applicable hereto by Fed. R. Bankr. P. 9023 (the "Motion for Reconsideration").

Lamento did not seek a stay pending appeal of the Sale Order pursuant to Fed. R. Bankr.

P. 8007 from this Court or the BAP.

In the Motion for Reconsideration, Lamento reiterated his contention that he was

the fee owner of the property pursuant to the Collector's Deed and, in light of the Debtor's

failure to redeem the property, he further asserted that the sale to Heaney was unlawful

under 11 U.S.C. § 363(f)(5) because he could not be compelled to accept a money

satisfaction of his interest.

Heaney opposed the Motion for Reconsideration, asserting, *inter alia*, that Lamento

was not the fee owner of the property, as the Collector's Deed conveyed an interest in the

property to him which was expressly subject to the Debtor's statutory right of

redemption.   Heaney further asserted that the Debtor's right of redemption would exist

until foreclosed by decree of the Land Court Department of the Massachusetts Trial Court

the ("Land Court") and that such a foreclosure action could not be brought within six

months of the date of the Collector's Deed pursuant to Mass. Gen. Laws ch. 60, §§ 64 and

65.  The Debtor also opposed the Motion for Reconsideration, likewise asserting that the

Collector's Deed conferred no right to possession of the property on Lamento prior to

entry of a foreclosure judgment by the Land Court and that there had been no such

foreclosure judgment issued by the Land Court.

13

As discussed further below, approximately three weeks after the issuance of the Sale Order, Lamento commenced an action in the Land Court on November 23, 2015, purportedly to foreclose the Debtor's right of redemption in the property (the "Land Court Action"), without filing a motion seeking relief from the automatic stay. This Court conducted a hearing on the Motion for Reconsideration and the objections on November 24, 2015, at which no party raised or reported Lamento's commencement of the Land Court Action.[6] The Debtor reported at the hearing that the sale to Heaney (the "Sale") closed on November 12, 2015, the last day of the 14 day period under Fed. R. Bankr. P. 6004(h).[7] Lamento appeared at the hearing *pro se* and represented that a friend drafted the Motion for Reconsideration on his behalf, but then adamantly asserted that he drafted the motion himself when asked for his friend's name by the Court. At the hearing, he ultimately replied to the Court's questions about the authorship of the motion by angrily screaming "It's none of your business[,]" following which he became belligerent and was removed from the courtroom by Court Security Officers. One day after the hearing, on November 25, 2015, the Court issued an order denying the Motion for Reconsideration, ruling that Lamento's interest in the property was not that of a fee owner and reiterating that the Sale was in accordance with 11 U.S.C. § 363(f)(5) because the holders of interests

---

[6] It appears from the record that neither the Debtor nor Heaney was aware of the Land Court Action until they were served with a citation issued by the Land Court months after Lamento commenced the action. *See* Ex. 16.

[7] Rule 6004(h) provides that "[a]n order authorizing the . . . sale . . . of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).

in the property could be compelled to accept money satisfaction of their interests, citing

In re Healthco Int'l, Inc., 174 B.R. 174 (Bankr. D. Mass. 1994).  Lamento did not appeal the

order denying his Motion for Reconsideration.

On November 30, 2015, Heaney filed a Motion to Intervene in the BAP Appeal as

an appellee which the BAP allowed. On the same date, he also filed a Motion to Dismiss

the BAP Appeal as moot because the Sale of the property to him had closed on November

12, 2015.   On December 11, 2015, the BAP granted Heaney's Motion to Dismiss the

Appeal, which Lamento did not timely oppose.  The BAP issued a Judgment of Dismissal

of the BAP Appeal on the same date.  Lamento did not appeal the Judgment of Dismissal.

G.  Conversion to Chapter 7

On December 1, 2015, while the BAP Appeal was pending, the Debtor filed a

Motion to Convert the case to one under Chapter 7, which the Court allowed on

December 16, 2015.  Lynne F. Riley was appointed the Chapter 7 trustee (the "Trustee").

On April 7, 2016, the Trustee filed a Motion to Authorize Disbursement of Sale Proceeds

(the "Disbursement Motion") with respect to the proceeds generated by the Sale.  In the

Disbursement Motion, the Trustee asserted that the Sale generated approximately

$115,000 in net proceeds.  She attached to the motion a deed executed by the Debtor which

conveyed the property to Heaney d/b/a On-Site Carpentry, dated November 10, 2015,

which was recorded at the Worcester District Registry of Deeds on November 12, 2015

(the "Heaney Deed").[8]  Levin's signature on the Heaney Deed was notarized by Christine

---

[8] The Court will refer to November 12, 2015 as the closing date of the Sale to Heaney.

Carey.  The Trustee proposed to distribute all of the net sale proceeds to the MassDEP in

partial satisfaction of its first priority lien on the property in the amount of $202,484,

subject to a carveout to be approved by the Court for administrative expenses incurred

by the Trustee for filing the Disbursement Motion pursuant to 11 U.S.C. § 506(c).

On April 28, 2016, Lamento objected to the Disbursement Motion, asserting, again,

that the property was not property of the bankruptcy estate because, *inter alia*, the Sale

did not comply with the Bankruptcy Code and that the property had been "stolen" from

him.  The MassDEP filed a response to the Disbursement Motion supporting the

proposed disbursement.  On May 4, 2016, the Court overruled Lamento's objection and

granted the Disbursement Motion.

H.  <u>The Adversary Proceeding</u>

On October 18, 2016, Heaney commenced the instant adversary proceeding by

filing the Complaint, in which he alleged that Lamento, on November 23, 2015, initiated

the Land Court Action without seeking relief from the automatic stay, to foreclose the

Debtor's right of redemption on the property.   Heaney asserted four counts in the

Complaint as follows: Willful Violation of the Automatic Stay (Count I); Violation of the

Court's Order of October 29, 2015 (Count II); Slander of Title (Count III); and Defamation

(Count IV).  The basis of Counts I and II is discussed in further detail below.  In Count

III, Heaney asserts that Lamento published untrue statements about Heaney's interest in

and title to the property after the Sale, causing him damage.  In Count IV, Heaney asserts

that Lamento made false statements about him personally, causing him damage.  On

November 17, 2016, Lamento filed a 78 page Answer to the Complaint, *pro se*, through

which he asserted criminal wrongdoing by the principals of the Debtor and impropriety by this Court due its approval of the Sale, in which he stated: **"You can't just say the words 'Abracadabra' 'Simon Says' 'Pursuant to 363'"** (emphasis in original).   The Answer also contained a request for attorney's fees as well as a jury trial demand on all claims but contained no counterclaims.   The Court entered a Scheduling Order on November 18, 2016.

On April 20, 2017, Heaney filed an Expedited Motion for Pre-Judgment Writ of Attachment through which he sought the issuance of a writ of attachment on real estate owned by Lamento located in Paxton, Massachusetts pursuant to Fed. R. Civ. P. 64, made applicable hereto by Fed. R. Bankr. P. 7064, and Lamento filed an opposition.   One day later, on April 21, 2017, the parties filed their Joint Pre-Trial Memorandum in which they stipulated to certain facts.   The Court conducted a hearing on the Attachment Motion and a pre-trial conference on April 25, 2017.   At the pretrial conference, the Court ruled that Counts III and IV of the Complaint (Slander of Title and Defamation) were the only counts in the Complaint subject to the right of a jury trial under the Seventh Amendment to the United States Constitution.   The Court issued an order on the date of the pretrial conference setting a trial date with respect to Counts I and II (Violation of the Automatic Stay and Violation of the Court's Order dated October 29, 2015), and deferring consideration of Counts III and IV as Lamento did not consent to a jury trial in this Court. Heaney consented to such bifurcation.   At the hearing on the Attachment Motion, the Court found that Heaney had a likelihood of success on the merits of the Complaint and entered an order of the same date allowing the motion.

17

## III. FACTS ADDUCED AT TRIAL

A. <u>The Witnesses</u>

Heaney called four witnesses at trial, including himself, Lamento, Eric R. Appleton ("Appleton"), the listing broker for the property, and Laura Marotta ("Marotta"), who was involved in the purchase of the property from Heaney in 2017. Heaney introduced 46 exhibits into evidence. Lamento, who appeared at the trial *pro se*, called no witnesses, and introduced no exhibits.

Lamento is a network engineer for Cisco Systems. He testified that he was a licensed real estate salesperson until one month prior to the trial. Lamento repeatedly insisted at trial that the Debtor's principal, Levin, had been arrested and indicted for fraud and that Heaney, because he bought the property from the Debtor, was also guilty of unspecified criminal wrongdoing. He offered no evidence to support his claims against either individual other than his own testimony. He also alleged that the Debtor and its principals committed fraud in listing the property on Schedule A and listing Lamento as a secured creditor, as opposed to an owner, on Schedule D, and that federal authorities, including the FBI, are "looking into the matter." He steadfastly maintained at trial that the Sale Order was unlawful and that Heaney's purchase of the property was part of a larger fraudulent scheme in which this Court was complicit. Lamento exhibited a hostile attitude at trial and his bitterness about the Sale to Heaney was patently evident.

Heaney, a single father of two daughters, graduated from high school, attended trade school in Ireland, and currently holds a general contractor's license. He has been in the building and carpentry business for 35 years and operates his business, On-Site

Carpentry, as a sole proprietorship.  The Court found his account of the dispute with Lamento reliable and credible.

Appleton is a licensed real estate broker and owner of a real estate management company with extensive commercial real estate experience.  He credibly testified about the effect of Lamento's actions on the property, Heaney, and Heaney's business.

Marotta is a former Worcester public school art teacher and the current executive director and co-founder of a non-profit entity called Creative Hub Worcester ("Creative Hub") with her business partner, Stacy Lord ("Lord").  Marotta, Lord, Creative Hub, and the Arts and Business Council of Greater Boston, Inc. (the "Arts Council") collaborated, beginning in 2016, to purchase the property from Heaney to develop it into a community arts center.  The Arts Council was the funding source for the project and was the entity that ultimately purchased the property from Heaney in 2017. Marotta credibly testified about the negative impact Lamento's actions had on the arts center project.

B. The Auction and Prepetition Events

Appleton testified that prior to the Whiz Kids' Chapter 11 petition, in the spring of 2015, he marketed the property as a "distressed" sale as the property was plagued by holes in the roof, rotting floors, decaying walls, and pervasive mold.  At the time he was marketing the property, he testified that he was aware that Whiz Kids planned to seek bankruptcy relief.   He disclosed this information to potential buyers who viewed the property, consisting mainly of builders and developers seeking to renovate the property.

Appleton testified that he showed the property to Heaney in or around May of 2015, after which Heaney made a purchase offer in the amount of $175,000, with

contingencies.  Appleton forwarded the offer to Whiz Kids and its counsel.  Delays ensued, and no sale was consummated.  When Heaney was asked at trial whether he had a prior business relationship with Levin, Heaney credibly replied "[a]bsolutely none whatsoever[,]"that he first met Levin the second time he visited the property, and that he has never been a partner of or associated with Levin in any manner.

Following Lamento's attendance at the Auction on May 20, 2015, Appleton testified that Lamento padlocked the building.  Lamento acknowledged that he placed locks on the property after he "took ownership" of the building. On June 16, 2015, Appleton e-mailed Lamento to inform him that the Collector's Deed conferred no right to possession of the property on him under Massachusetts law, and that he had unlawfully taken possession of the property.  Lamento responded by e-mail on the same date: "I am the current owner [of the property] as you can check the registry of deeds." Following this exchange, Erin M. Martin, the Deputy Assistant Tax Collector for the City of Worcester e-mailed Lamento on June 23, 2015, reiterating that that the Collector's Deed conferred no right to possession of the property prior to the entry of a redemption foreclosure judgment by the Land Court.  Lamento acknowledged receiving the e-mail but said Ms. Martin was "incorrect."

C.  The Bankruptcy Filing

According to Appleton, following Whiz Kids' bankruptcy filing on August 11, 2015, Debtor's counsel advised that any sale of the property would take place in the context of the bankruptcy case, subject to proceedings in the court.  After the petition

date, Appleton encouraged Heaney and other potential buyers to bid on the property

through the bankruptcy court sale process.

D. <u>The Sale</u>

As discussed above, the original Sale Hearing occurred on October 21, 2015, and

Heaney was the successful purchaser with an approved bid of $130,000.   Lamento

repeatedly asserted at trial in this adversary proceeding that the property belonged to

him and did not constitute property of the Debtor's estate, although, he acknowledged

in his testimony that the Debtor did own a right of redemption to the property.[9]   He

maintained that Heaney purchased only the right of the redemption at the Sale Hearing

which, he asserted, expired in November of 2015: "[James Levin] could sell what he could

sell and that was the right of redemption."

The Collector's Deed, described above and introduced as an exhibit at trial,

provided, in relevant part, the following: "[S]ubject to the statutory right of redemption,

. . . [T]he whole of said land [the property] was sold to the grantee at said auction on **May

20, 2015,** for non-payment of taxes as defined in § 43 of [Mass. Gen. Laws ch. 60] assessed

thereon to:  **WHIZ KIDS DEVELOPMENT LLC** for the Fiscal Year **2014** which were not

paid. . . ." (emphasis in original). Lamento acknowledged at trial that he received timely

notice of the Sale Hearing and that he saw the Sale Order shortly after its issuance, but he

consistently maintained at trial that the only thing sold by the Debtor to Heaney was the

right of redemption to the property.   At trial, he continuously referred to the above

---

[9] Lamento frequently asserted that Levin was the owner of the property and incorrectly
used his name interchangeably with that of the Debtor.

quoted clause "the whole of said land was sold to the grantee at said auction . . . ." rather than the language appearing before it: "subject to the statutory right of redemption[,]" as the basis for his claim that he was the fee owner of the property.  When asked about the injunctive provisions of the Sale Order, Heaney testified, again, that such provisions related only to the right of redemption and that those provisions did not bind him "because the law says a purchaser can foreclose a right of redemption" and "as far as I know, the courts don't eliminate the laws."  At trial, Lamento conceded that the Debtor's right of redemption had not expired as of the petition date, however, he asserted that it expired on November 20, 2015, six months following the Auction.

Following the Sale on November 12, 2015, Heaney testified that he began cleaning out the building which was in "horrible" condition, applying for various permits, and performing necessary masonry work.  While Heaney initiated the renovation process, Lamento began a social media campaign to express his distress and objections over the Sale, alleging a criminal conspiracy.  Lamento admitted at trial to posting an online comment on November 16, 2015, on a WGBH.org blog entitled "MassPoliticsProfs" under an article appearing on the blog entitled "How Corrupt is Massachusetts?"  In the comment section of the blog, Lamento accused this Judge of corruption and collusion in a "real estate scam" involving "hundreds of thousands of dollars" and a "straw buyer." In defense of his actions, Lamento recounted at trial other "scams" he believed Levin had perpetrated and continued to advance his theory that the Sale was procured by fraud and collusion among the Court, Heaney, Appleton, the Debtor and Levin. Shortly after posting on the WGBH.org blog, Lamento also testified that he prepared and mailed a

notice to Heaney's attorney, Attorney Michael Tremblay ("Attorney Tremblay"), with the heading "Attention All Black Friday Shoppers!" which provided, in part: "US Bankruptcy Judge Joan Feeney slashes price on 2 Ionic Avenue, Worcester. . . ."  Lamento also hand wrote on the cover page to the notice a number of *ad hominem* attacks on this Judge.

  E.  <u>The Land Court Action and Appeal</u>

  On November 23, 2015, during the pendency of the Debtor's bankruptcy case and prior to conversion, Lamento initiated the Land Court Action purportedly to foreclose the Debtor's right of redemption on the property, without seeking relief from the automatic stay.  When asked whether he was aware of the automatic stay when he commenced the Land Court Action, Lamento testified that the stay "does not apply in all cases."  He added that he filed the Land Court action on November 23, 2015 because he had to wait six months to do so from the Auction date of May 20, 2015, pursuant to Mass. Gen. Laws ch. 60.

  The Land Court issued a Citation on February 29, 2016, bearing a heading of "Eugene M. Lamento v. Whiz Kids Development, LLC" which, in part, provided: "You have been named as a party who may have an interest in this proceeding." It also provided a deadline for Whiz Kids to file an answer.  At some point, Heaney was also served with the Citation as an interest holder in the property.  Attorney Tremblay advised Lamento by letter dated March 17, 2016, that his commencement of the Land Court Action violated the automatic stay, and he requested that Lamento dismiss the action immediately.  On the same date, Attorney Tremblay filed a notice of appearance on behalf

of Heaney in the Land Court and a suggestion of bankruptcy with respect to the Debtor.

Six days later, on March 23, 2016, Lamento filed a "Response to Suggestion of Bankruptcy

and Counter Suggestion of Incompetent Bankruptcy Attorneys Michael Tremblay and

Barry Levine," alleging, among other things, legal malpractice by the attorneys involved

and corruption on the part of this Court.

On March 29, 2016, Heaney filed a Motion to Dismiss the Land Court Action[10] to

which Lamento filed an objection supported by 37 exhibits, again, alleging a "fraudulent

sale" of the property and criminal collusion in the sale process.  Lamento testified at trial

in this Court that he also asserted in his objection that Levin "fronted" the purchase price

for the property for Heaney.  The Land Court conducted a hearing on the Motion to

Dismiss on April 28, 2016, and issued an Order of Dismissal (Foster, J.) the following day,

April 29, 2016, which, in part, provided: "The bankruptcy proceeding acts to stay any

proceeding in this court to foreclose the right of redemption of the property held by Whiz

Kids and confer title to the property in Mr. Lamento." The Land Court rejected Lamento's

attempt to circumvent this Court's Sale Order, ruling further:  "Having failed to stop the

Order for Sale in the Bankruptcy Court, [Lamento] cannot now come to this court and

ask it to reverse that Order."

On May 25, 2016, Lamento appealed the Land Court's Order of Dismissal to the

Massachusetts Appeals Court.  He filed an appellate brief in September, 2016, supported

by a record appendix in which he made *ad hominem* attacks on this Court and the Land

---

[10] The caption of the Motion to Dismiss reflects that Heaney was also a defendant in the
Land Court Action.

Court.  He also included in the record a photograph of two men he identified in a caption as Heaney and Levin acting in "Collusion and Conspiracy to Defraud U.S. Bankruptcy Court," although he testified at trial that the man he identified in the picture as Levin was, in fact, not Levin but Appleton.  He maintained that he misidentified Levin because Appleton was trying to disguise himself with sunglasses.  Heaney, as the appellee, filed a lengthy brief with the Massachusetts Appeals Court.

F.  Post-Sale Development of the Property

Heaney testified that after the Sale, he originally intended to develop the property into a storage facility.  He changed his plans, he testified, after he was contacted by the Worcester Economic Development Office to inquire whether Heaney would consider developing the property into an arts facility.  Heaney testified that he was very enthusiastic about the idea and sought to move forward with it.  Marotta testified that in the spring of 2016, she and Lord were in communications with City of Worcester officials and Heaney to develop the property into a community arts center.  She testified that the negotiations were positive, a project of this type required the support of state and local officials and necessitated a lot of lobbying, and that all parties were supportive of the project. Appleton testified that following a series of meetings among members of the Economic Development Office, Marotta and Lord, Heaney agreed in May of 2016 to sell the property to the Arts Council in collaboration with Marotta, Lord and Creative Hub for use as an arts center (hereinafter, the "Project").

Heaney testified that he prepared the property for an open-house to showcase the Project which occurred on June 25, 2016.  According to Heaney, the open-house went

extremely well and generated substantial positive community interest and publicity. Appleton testified that about three weeks after the open-house, Heaney had a "hand-shake deal" to close on a sale of the property to the Arts Council in August or September of 2016.

Following the open-house, Lamento testified that he posted an online comment on September 5, 2016, in response to an article posted about Levin on a website called "FraudsWatch." In the comment section, Lamento wrote that there had been collusion between Levin and Heaney. Lamento testified that he wrote the comment "to show that this is a corrupt sale by James Levin . . . to somebody that's in collusion with him." In his comment, Lamento also alleged corruption by this Court and the Land Court and further contended that "I have been reporting fraud by Levin for the past year to the FBI and Attorney General and been ignored [sic]."

Lamento testified that he took pictures of Heaney and Levin, which he believed to be evidence of collusion between the two, and showed them to members of the media, including a columnist for Worcester Magazine who wrote an article about Lamento's legal dispute over the property in the magazine published on September 29, 2016. Lamento posted an online comment in response to the article in which he stated: "Peter Heaney, the straw buyer, can't get title insurance because he doesn't own the property." He further commented that Levin had been indicted and arrested and that Heaney "may be next." He expressed frustration at trial with this Court and federal and state officials about their response to his accusations of fraud and persisted in his hope that more people would be arrested. Lamento also asked Heaney at trial to admit that he knew

Christine Carey ("Carey"), an associate of Levin who notarized Levin's signature on the

Heaney Deed.  Heaney responded "I have never met [her] in my life."

Lamento testified that he contacted various officials, including the Office of the

Massachusetts Attorney General, the FBI, and the Building Inspector for the City of

Worcester, about his allegations of collusion.  He explained:

> Well, I hear on the radio if you see criminal activity you should report it
> and I did. I'm doing a public service. If you see criminal activity which you
> believe to be criminal, you don't have to prove it. You really have to – if you
> believe something is criminal you report it to authorities and that's what I
> was doing.
>
> ***
>
> If you see criminal activity according -- including fraud, corruption, you
> should report it and I did that as a good American. Yes, I did.

On October 2, 2016, Lamento testified, he posted an on-line comment on the

Creative Hub Facebook page under the pseudonym "Vicki Power," in which he stated:

"Peter Heaney will likely be arrested soon for real estate fraud and conspiracy to commit

bankruptcy fraud." Lamento posted another comment on the Creative Hub Facebook

page, stating: "Peter Heaney will be indicted soon for real estate fraud."  At trial, Lamento

testified that he believed Heaney was going to be arrested, as various state and federal

agencies told him that "more people are going to be arrested."

Marotta testified that she became aware of Lamento when he started posting

comments on the Creative Hub Facebook page, identifying himself as the owner of the

property and alleging fraud and criminal behavior.  She testified that Lamento frequently

parked his car outside the property and took pictures of those coming and going.  Further,

she testified, his presence had a detrimental effect on the image of the Project and was frightening to her personally. When asked why he surveilled the property, Lamento testified that he "wanted to see what was going on with the building that [he] had purchased. . . . "

G. Lamento's Contacts with the Arts Council

On October 14, 2016, Lamento testified, he sent an e-mails to the Director of the Arts Council, James Grace ("Grace"), in which he described Levin and Heaney as "scam artists" and described a "fake sale" to "straw buyer" Peter Heaney ". . . [who] recorded a fake deed [on] November 12, 2015." Lamento testified that he wrote the e-mails to inform Grace that Heaney did not have good title to the property, and that Lamento was the "current owner [of the property] until it gets redeemed."

As a result of Lamento's e-mails to Grace, Marotta testified, progress on the Project slowed due to concerns by the Arts Council board members about Heaney's title to the property. Appleton supported Marotta's account and testified that based upon the e-mails and blog postings made by Lamento, the Arts Council grew concerned about the status of Heaney's title to the property even though Heaney had obtained title insurance shortly after the Sale from First American Title Company, written by Heaney's counsel, Attorney Kevin Hart. Due to the Arts Council's concerns, Appleton testified that a closing of the sale of the property in August or September of 2016 did not occur as contemplated by the hand-shake deal of June, 2016. According to Appleton, Creative Hub and the Arts Council were having "second thoughts about the public image of the building" and they were concerned about being "tied up in . . . grotesque litigation."

Heaney also testified that Grace expressed his concerns about the image of the Project, telling him: "We don't want [your] legal issues to become our legal issues."

H. <u>Sale of the Property from Heaney to the Arts Council</u>

Heaney finally closed the sale of the property on March 22, 2017, in consideration of $990,000, and a deed to the Arts Council was recorded on March 31, 2017. Following the sale of the property to the Arts Council, Appleton testified that he continued to work on other projects for Heaney, including a potential purchase and renovation of the Worcester County Courthouse, for which Heaney bid $1.3 million.  Appleton testified that Heaney had submitted the "better deal" but he was not awarded the bid because, he believed, City Officials wanted "less publicity."  Heaney also testified about the bid and said he had positive media coverage and feedback from local officials for the project and thought he had a "great shot" at getting an approved bid.

I. <u>Lamento's Defense</u>

The Court permitted Lamento to provide a narrative on cross-examination as he appeared at the trial *pro se*.  He made a lengthy statement at trial in his defense during which he reiterated that he was the owner of the property pursuant to the Collector's Deed, Levin committed fraud in this Court, the Sale was effected through collusion between Levin and Heaney who also violated the 14-day stay imposed by Fed. R. Bankr. P. 6004(h), Carey illegally notarized the Heaney Deed because, he alleged, she had an ownership interest in the property with Levin, and that 11 U.S.C. § 108 operated as an exception to the automatic stay.

J.   Damages

Heaney testified that he incurred $14,000 in attorney's fees to defend the Land Court Action, the appeal at the Massachusetts Appeals Court, and the BAP Appeal. He testified that he also incurred an additional $2,500 in attorney's fees to Attorney Kevin Hart after he purchased the property to "straighten out the title" resulting from the misinformation Lamento had circulated.  Heaney testified that while he waited for the Arts Council sale to close, which extended 6 months beyond the hand-shake deal due to Lamento's actions, he incurred $6,000 per month in carrying costs related to the property, including costs for insurance and taxes, fire alarm monitoring services, water and other utilities, snow removal, property maintenance, and loss of return on investment.  Heaney testified that he also suffered emotional distress as a result of Lamento's social media campaign which caused him to worry about the damage to his business and personal reputation and his children who discovered Lamento's allegations while online:

> "[T]hey were on the internet. . . . and they Googled my name  . . . and they came running into the room hysterical saying, 'Dad, are you going to be arrested?' and I said, 'What are you talking about?' And then they showed me the blog and I was furious. It was Mr. Lamento that said Jim Levin had been arrested and that he's going to be arrested shortly."

He testified that he endured sleepless nights and was very distressed about Lamento's cyber-bullying tactics.  He also attributed his loss of the bid to renovate the Worcester County Courthouse to the "shadow" cast by Lamento and testified that his business also suffered and is presently "not where it should be" because of the negative publicity associated with Lamento.

## IV. POSITIONS OF THE PARTIES

### A.  <u>Heaney</u>

With respect to Count I, Heaney alleges in the Complaint that Lamento violated the automatic stay provisions of § 362(a)(1), (3) and (4) when he filed the Land Court Action and appealed its dismissal without seeking relief from the stay.  In his post-trial brief, he relies on § 362(a)(1) and (6) with respect to the filing of Land Court Action and also briefly mentions that Lamento violated the stay under § 362(a)(3) when he continued to padlock the property after the petition date through October, 2015, although this action pre-dated Heaney's ownership of the property.  Heaney further maintains that he has standing to assert a claim for damages, including punitive damages, for willful violation of the automatic stay under § 362(k), arguing that many courts have allowed creditors to seek redress under that provision.  He reasons that "if the economic harm suffered by a buyer at a § 363 sale is not remedial under § 362(k), then the teeth of § 363 are eviscerated."

With respect to Count II, Heaney complains about the extensive lengths to which Lamento went to undermine and cast doubt on the validity of the Sale Order, the authority and rulings of this Court and the Land Court, the legitimacy of Heaney as the lawful buyer of the property, and the status of his title to the property.  He maintains that Lamento's actions, including his repeated accusations of corruption, bribery, and collusion and his attempts to thwart the sale and financing of the property from Heaney to the Arts Council, constitute contempt of the injunctive provisions of Sale Order for which the Court may impose monetary sanctions as well as injunctive relief against Lamento to prevent further abuses by him pursuant to 11 U.S.C. § 105(a).

Heaney contends that he has suffered significant damages as a result of Lamento's contempt and his violation of the automatic stay, including damages for attorney's fees and costs incurred by him for defending title to the property, prosecuting this adversary proceeding, and defending the Land Court Action and subsequent appeal, as well as the BAP Appeal. In addition, he contends that he is entitled to damages for his emotional distress, especially in light of his daughters' discovery of Lamento's allegations, as well as his stress and worry about the injury Lamento inflicted on his business and personal reputation.   He also maintains that he sustained damages for the loss of economic opportunity related to his unaccepted bid to renovate the Worcester County Courthouse. Lastly, Heaney contends, Lamento's outrageous and vindictive conduct merits the imposition of punitive damages.

B.  <u>Lamento</u>

With respect to Count I of the Complaint, Lamento contends that he did not violate the automatic stay.  He maintains that the stay "doesn't . . . toll or extend a redemption period already underway prior to the filing of the bankruptcy case," and that the Debtor had until the later of 60 days after the order for relief under 11 U.S.C. § 108(b) or until the deadline established under state law to exercise its right of redemption. Under this analysis, he concludes that the Debtor's redemption period expired on November 20, 2015, the deadline under state law, after which he was free to commence the Land Court Action.  In support of his position he relies on <u>229 Main St. Ltd. P'ship v. Massachusetts Dep't of Envtl. Prot. (In re 229 Main St. Ltd. P'ship)</u>, 262 F.3d 1 (1st Cir. 2001), this Court's decision in <u>In re Tomaselli</u>, No. 14-10736-JNF, 2014 WL 4322404, at *1 (Bankr. D. Mass.

32

Aug. 29, 2014), and a number of other cases for which he provided only case names and numbers but no further identifiable information, such as dates of any decisions or the jurisdiction in which the case is or was pending.

Next, Lamento asserts that Heaney violated the stay imposed by Fed. R. Bankr. P. 6004(h) when he recorded the Heaney Deed on November 12, 2015, a date within 14 days of the October 29, 2015 Sale Order. He adds, "[v]iolation of the 14 day automatic stay voided the recording of the [Heaney] [D]eed[,]" although he provides no authority for that position.

With respect to Count II of the Complaint, Lamento asserts that he did not violate the Sale Order because Mass. Gen. Laws ch. 60, § 65 permitted him to file the Land Court Action six months after the date of the Auction. He adds that "this right cannot be hijacked by a judge."

In addition to the above arguments relative to the Complaint, Lamento further reiterates his previously asserted positions that he is the current title holder of the property, the Debtor owned only a right of redemption on the petition date, and that the Sale and the Debtor's bankruptcy case are the result of fraud, collusion, and corruption. He adds that Heaney committed perjury at trial when he testified that he had no relationship with Carey. Lastly, he repeats his claim for a jury trial in this adversary proceeding, a right this Court ruled on April 25, 2017 did not apply to Counts I and II of the Complaint.

## V. DISCUSSION

A. <u>The Finality of the Sale Order</u>

This proceeding is a dispute concerning the enforcement of this Court's Sale Order issued pursuant to the provisions of 11 U.S.C. §§ 363 and 541, following the submission of testimonial evidence concerning the value of the property.  Lamento did not rebut the evidence of valuation produced at the Sale Hearing, submit a timely counteroffer for the property despite an opportunity to do so, introduce evidence that the proposed sale of the property was fraudulent or advance a valid legal theory why a sale to Heaney or any other qualified bidder should not be permitted.

The definition of property of the estate under § 541 of the Bankruptcy Code is extremely broad and encompasses "all legal or equitable interests of the debtor in property as of the commencement of the case[,]" "wherever located and by whomever held." 11 U.S.C. § 541(a)(1).  In order to determine the existence and scope of a debtor's "legal or equitable interests" for purposes of § 541(a)(1), it is well established that federal courts typically must look to state law. *See* <u>Butner v. United States</u>, 440 U.S. 48, 54, 99 S. Ct. 914 (1979).  Although the property was subject to numerous liens and encumbrances on the petition date, it is undisputed that the Debtor held a right to redeem the property on that date under Massachusetts law.  *See* <u>In re Stacy</u>, 99 B.R. 142, 149 (D. Mass. 1989) ("Even after land has been taken for taxes, any person having interest in the land retains a right of redemption until such time as a petition for the foreclosure of all rights of

redemption is filed in land court[,]" citing Mass. Gen. Laws ch. 60, §§ 62 and 65).[11]  Indeed, the Collector's Deed expressly referenced the Debtor's right of redemption, and Lamento acknowledged such right at the Sale Hearing and at trial.  In his post-trial brief, Lamento stated that the redemption right expired on November 20, 2015, and he initiated the Land Court Action on November 23, 2015, purportedly to foreclose such right.

As the Debtor's right of redemption in the property could not have been foreclosed prior to November 20, 2015 under Mass. Gen. Laws ch. 60, § 65, the Debtor held an interest in the property on the petition date (August 11, 2015), albeit an encumbered one.

---

[11] Mass. Gen. Laws ch. 60, § 62, in relevant part, provides:

> Any person having an interest in land taken or sold for nonpayment of taxes, including those assessed under sections twelve, thirteen and fourteen of chapter fifty-nine,  . . . , at any time prior to the filing of a petition for foreclosure under section sixty-five, if the land has been taken or purchased by the town and has not been assigned, *may redeem the same by paying or tendering to the treasurer the amount of the tax title account of the land being redeemed . . . .*

Mass. Gen. Laws ch. 60, § 62. (emphasis added).

Mass. Gen. Laws ch. 60, § 65, in relevant part, provides:

> Except as provided in section sixty-two, whoever then holds the title to land acquired by a sale or taking for taxes may bring a petition in the land court for the foreclosure of all rights of redemption of said land either *after six months from the sale* or taking or in case of a city or town, at any time following the sale or taking if the buildings thereon have been found to be abandoned property pursuant to section eighty-one A, or there has been a certification pursuant to section 81B that the redemption amount as determined pursuant to section 62 exceeds the assessed value of the parcel; ….

Mass. Gen. Laws ch. 60, § 65. (emphasis added).

Lamento held an interest in the property as security for the repayment of his purchase price, i.e., he had a lien on the property.  *See* Mass. Gen. Laws ch. 60, § 45, ("The title thus conveyed shall, until redemption or until the right of redemption is foreclosed as hereinafter provided, be held as security for the repayment of the purchase price . . . No sale hereafter made shall give to the purchaser any right to possession of the land until the right of redemption is foreclosed . . . . "); Jenney v. Tilden, 270 Mass. 92, 94, 169 N.E. 669, 670 (1930) ("Until the consummation of foreclosure proceedings the purchaser of a tax sale holds title merely as security for repayment of the purchase price, together with all intervening costs and terms imposed for redemption including charges with interest thereon.").  *See also* In re Pittman, 549 B.R. 614 (Bankr. E.D. Pa. 2016) (in a Chapter 13 case filed during a 9 month redemption period under Pennsylvania statute, court ruled that the debtor could redeem the property by treating purchaser's right to payment of the redemption amount as a modifiable secured claim in a Chapter 13 plan); Francis v. Scorpion Group, LLC (In re Francis), 489 B.R. 262, 266–67 (Bankr. N.D. Ga. 2013) (court held that a debtor who filed Chapter 13 petition during tax taking redemption period under Georgia statute had, on the petition date, all the rights to the property other than legal title, including the rights to possession, use, bar access, and redeem).

Pursuant to § 363(b) a trustee, or a debtor in possession, may use or sell property of the estate in which the debtor had an equitable interest, as well as legal title, on the petition date.  *See* United States v. Whiting Pools, Inc. 462 U.S. 198, 103 S. Ct. 2309 (1983); Ivy Rest. Grp., Inc., No. 10-18394-JNF, 2011 WL 282758, at *3 (Bankr. D. Mass. Jan. 25, 2011); *see also* Ford v. Duggan (In re Duggan), 571 B.R. 1, 12-13 (Bankr. D. N.H. 2017)

(Chapter 7 trustee permitted to sell property free and clear of liens under § 363(h), notwithstanding that property had been taken by city for unpaid taxes and that an action filed by the city was pending in Massachusetts Land Court to foreclose co-owners' equity of redemption); In re Healthco Int'l, Inc., 174 B.R. 174 (Bankr. D. Mass. 1994); 11 U.S.C. § 363(f).

Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the . . . sale . . . of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). The purpose of this rule is to provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented. In re Borders Grp., Inc., 453 B.R. 477, 486 (Bankr. S.D. N.Y. 2011) (citation omitted).  Lamento did not seek or obtain a stay pending appeal of the Sale Order, and the order became final following the expiration of the 14-day stay period, specifically after November 12, 2015.  After that date, Lamento was simply powerless to vacate the Sale Order or undo the Sale.  Indeed, the BAP dismissed the BAP Appeal on December 11, 2015, based on mootness in light of the Sale.  The Sale Order is a valid, enforceable, and final order of this Court, and it cannot be reversed or undone now. Accordingly, the Court will not entertain here Lamento's previously overruled, yet repeatedly asserted, unsupported contention that the Sale was invalid due to fraud, collusion, or conspiracy.

B. Jurisdiction

Having determined that the Sale Order is final, the Court turns to the next threshold issue of whether it has jurisdiction over this dispute involving two nondebtors.

The general grant of bankruptcy jurisdiction is found in 28 U.S.C. § 1334, which, in

pertinent part, provides:

> (a) Except as provided in subsection (b) of this section, the district courts
> shall have original and exclusive jurisdiction of all cases under title 11.

> (b) . . . [N]otwithstanding any Act of Congress that confers exclusive
> jurisdiction on a court or courts other than the district courts, the district
> courts shall have original but not exclusive jurisdiction of all civil
> proceedings arising under title 11, or arising in or related to cases under
> title 11.

28 U.S.C. § 1334(a) and (b).

Pursuant to 28 U.S.C. § 157(a), "Each district court may provide that any or all

cases under title 11 and any or all proceedings arising under title 11 or arising in or related

to a case under title 11 shall be referred to the bankruptcy judges for the district."   11

U.S.C.   § 157(a).   In this district, the United States District Court has referred to the

bankruptcy court all bankruptcy cases and proceedings over which the district court may

exercise jurisdiction under either § 1334(a) or (b).[12]   Pursuant to § 157(b) "Bankruptcy

judges may hear and determine all cases under title 11 and all core proceedings arising

under title 11, or arising in a case under title 11, referred under subsection (a) of this

---

[12] Rule 201 of the Local Rules of the District Court for the District of Massachusetts
provides as follows:

> Pursuant to 28 U.S.C. § 157(a), any and all cases arising under Title 11
> United States Code and any and all proceedings arising under Title 11 or
> arising in or related to a case under Title 11 shall be referred to the judges
> of the bankruptcy court for the District of Massachusetts.

LR, D. Mass 201.

section, and may enter appropriate orders and judgments, subject to review under section

158 of this title." 28 U.S.C. § 157(b)(1).  Core proceedings "include but are not limited to—

... "(G) motions to terminate, annul, or modify the automatic stay"[13] . . . and "(N) orders

approving the sale of property other than property resulting from claims brought by the

estate against persons who have not filed claims against the estate." 28 U.S.C. §

157(b)(2)(G) and (N).

Proceedings "aris[e] under title 11" when the Bankruptcy Code itself creates the

cause of action. Stoe v. Flaherty, 436 F.3d 209, 217 (3d Cir. 2006), *as amended* (Mar. 17,

2006). "'Arising in' proceedings generally 'are those that are not based on any right

expressly created by title 11, but nevertheless, would have no existence outside of the

bankruptcy.'" New England Power & Marine, Inc. v. Town of Tyngsborough (In re

Middlesex Power Equip. & Marine, Inc.), 292 F.3d 61, 68 (1st Cir. 2002) (citing, *inter alia*,

Wood v. Wood (In re Wood), 825 F.2d 90, 97 (5th Cir. 1987)).  A "related to" proceeding

does not "arise under" or "arise in" the bankruptcy case, but is one that is sufficiently

related to the bankruptcy case to be within the scope of bankruptcy jurisdiction. *See* Pacor,

Inc. v. Higgins, 743 F.2d 984, 994 (3d Cir.1984), *overruled on other grounds,* Things

Remembered, Inc. v. Petrarca, 516 U.S. 124, 116 S. Ct. 494, (1995) (a proceeding is "related

to" the bankruptcy case if the outcome of that proceeding could conceivably have any

effect on the estate being administered in bankruptcy).

---

[13] *See* Budget Serv. Co. v. Better Homes of Virginia, Inc., 804 F.2d 289, 292 (4th Cir. 1986)
( "[A] proceeding to prosecute a violation of the automatic stay is a core proceeding
within the meaning of 28 U.S.C. § 157(b)(1) and (2).").

Moreover, this Court, like all other bankruptcy courts, has jurisdiction to interpret and enforce its own orders. *See* Travelers Indem. Co. v. Bailey, 557 U.S. 137, 151, 129 S. Ct. 2195 (2009) ("[T]he Bankruptcy Court plainly had jurisdiction to interpret and enforce its own prior orders."); In re Middlesex Power Equip. & Marine, Inc., 292 F.3d at 68 ("The underlying dispute here involves a subsequent purchaser's interpretation of a sale order 'free and clear of liens' under 11 U.S.C. § 363(b), an order that can only be issued by a bankruptcy court, and so it is one that arises in a case under title 11 or perhaps arises under title 11."). *See also* Elliot v. Gen. Motors LLC (In re Motors Liquidation Co.), 829 F.3d 135 (2d Cir. 2016), *cert. denied*, __ U.S. __, 137 S. Ct. 1813 (2017), in which the United States Court of Appeals for the Second Circuit ruled:

> A bankruptcy court's decision to interpret and enforce a prior sale order falls under this formulation of "arising in" jurisdiction. An order consummating a debtor's sale of property would not exist but for the Code, *see* 11 U.S.C. § 363(b), and the Code charges the bankruptcy court with carrying out its orders, *see* id. § 105(a) (providing that bankruptcy court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title"). Hence, a bankruptcy court "plainly ha[s] jurisdiction to interpret and enforce its own prior orders." Travelers Indem. Co. v. Bailey, 557 U.S. 137, 151, 129 S. Ct. 2195, 174 L. Ed. 2d 99 (2009).

829 F.3d at 153. *See also* Canzano v. Ragosa (In re Colarusso), 280 B.R. 548, 554–55 (Bankr. D. Mass. 2002), *aff'd* 382 F.3d 51 (1st Cir. 2004) (court, relying on In re Middlesex Power Equip. & Marine, Inc., *supra*, ruled it had "arising in" or "arising under" jurisdiction over complaint filed by successful bidder in § 363 sale seeking injunctive relief and enforcement of the sale order against third party who asserted a claim by adverse possession to the subject property in the Land Court after the issuance of the sale order).

Document     Page 41 of 56

The United States Court of Appeals for the First Circuit recently addressed the nature of "arising in" jurisdiction in <u>Gupta v. Quincy Med. Ctr.</u>, 858 F.3d 657 (1st Cir. 2017).   In <u>Gupta</u>, the debtors signed an asset purchase agreement (the "APA") effectuating a sale of substantially all of their assets to Quincy Medical Center, a Steward Family Hospital, Inc. ("Steward"), one day before filing their voluntary Chapter 11 petitions.   On the petition date, the debtors filed a sale motion pursuant to 11 U.S.C. §§ 363 and 365 seeking bankruptcy court approval of the APA.   Portions of the APA addressed the continued employment of the debtors' former employees by Steward, and its obligation to pay severance in the event Steward terminated any former employee of the debtors.   The bankruptcy court issued a sale order approving the APA, and the debtors thereafter filed a plan of reorganization which the Court later confirmed.   The sale order and the plan each contained provisions regarding the retention of jurisdiction by the bankruptcy court over any disputes arising under them. Following confirmation, the appellants received letters from the debtors providing that their employment was terminated, effective as the day the asset sale was closed.   The appellants sought severance pay from the debtors by moving for allowance of administrative expenses. The bankruptcy court found that the claims were not entitled to administrative expense status but ruled that the appellants' motions should be treated as seeking alternative relief for an order directing Steward to pay their claims.   The bankruptcy court found it had subject matter jurisdiction over the dispute pursuant to the retention of jurisdiction provisions of the sale order and the court's authority to interpret and enforce its own prior orders. <u>Id</u>. at 659-661; <u>In re Quincy Med. Ctr., Inc.</u>, 466 B.R. 26, 31-32 (Bankr. D. Mass. 2012).

Following a hearing, the bankruptcy court found Steward liable to the appellants under the APA for their severance. In re Quincy Med. Ctr., Inc., 479 B.R. 229, 237 (Bankr. D. Mass. 2012), *vacated sub nom.* Quincy Med. Ctr. v. Gupta, No. CIV.A. 12-40128-RWZ, 2015 WL 58633 (D. Mass. Jan. 5, 2015), *aff'd*, 858 F.3d 657 (1st Cir. 2017). On appeal, the United States District Court for the District of Massachusetts ruled that the bankruptcy court lacked subject matter jurisdiction over the claims for severance payments against Steward and vacated the judgments against it. Quincy Med. Ctr. v. Gupta, No. CIV.A. 12-40128-RWZ, 2015 WL 58633, at *1 (D. Mass. Jan. 5, 2015), *aff'd*, 858 F.3d 657 (1st Cir. 2017).

On further appeal, the United States Court of Appeal for the First Circuit affirmed the District Court, observing:

> [I]t is not enough for "arising in" jurisdiction that a claim arose in the context of a bankruptcy case. Instead, our case law makes clear that for "arising in" jurisdiction to apply, the relevant proceeding must have "no existence outside of the bankruptcy." . . . . Hence, there is no "but for" test for "arising in" jurisdiction as Appellants suggest. That is, "the fact that a matter would not have arisen had there not been a bankruptcy case does not ipso facto mean that the proceeding qualifies as an 'arising in' proceeding." . . . Instead, the fundamental question is whether the proceeding by its nature, not its particular factual circumstance, could arise <u>only</u> in the context of a bankruptcy case. . . .

> In re Middlesex Power Equip. & Marine, Inc. provides no support for Appellants' contrary position. In that case, we held, inter alia, that a bankruptcy court had "arising under" or "arising in" jurisdiction to decide the scope of a sale order provision authorizing certain assets to be sold "free and clear of liens." 292 F.3d at 68; *see also* Elliott v. GM LLC (In re Motors Liquidation Co.), 829 F.3d 135, 153 (2d Cir. 2016) [*supra*]. Appellants point to this language, insisting that their claims, "although framed as state law claims . . . depend upon an interpretation of the Bankruptcy Court's Sale Order." Appellants' argument misses the mark, however, because the bankruptcy court's mere approval of Debtors' sale of assets to Steward did not automatically create jurisdiction over all future contract disputes somehow related to the APA. Hence, unlike <u>Middlesex Power Equip. &</u>

42

Marine, Inc., which involved the interpretation of a specific provision of a sale order, Appellants here have failed to identify any provision of the Sale Order itself or any related questions of bankruptcy law underlying their claims that would require interpretation by the bankruptcy court. Indeed, the bankruptcy court's own analysis of Appellants' claims was based entirely on the terms of the APA and state contract law. The court mentioned the Sale Order only in reference to the retention-of-jurisdiction provision.

Gupta, 858 F.3d at 664-65 (emphasis in original) (footnote omitted).

### 1.   Counts I and II

Unlike the dispute in Gupta, which was based entirely on a state law breach of contract theory, and which is distinguishable from the instant case, Heaney's claims against Lamento in Counts I and II of the Complaint are based upon bankruptcy law and the Sale Order, including its injunctive provisions.   The underlying dispute in those counts implicates the sale of property free and clear of Lamento's interest and thus the scope of the sale order. *See* In re Middlesex Power Equip. & Marine, Inc., 292 F.3d at 68. Moreover, the dispute involves this Court's determination of the applicability of the automatic stay (Count I) and whether Lamento is in contempt of the injunctive provisions of its Sale Order (Count II), which was entered pursuant to 11 U.S.C. §§ 363 and 541 as well as the United States Supreme Court's ruling in United States v. Whiting Pools, 462 U.S. 198, 103 S. Ct. 2309 (1983).   The dispute in Counts I and II could have arisen only in the context of a bankruptcy case and would have no existence outside of the Debtor's bankruptcy case.   The Court rules that Count I of the Complaint is a core proceeding "arising under" title 11 and that Count II is a core proceeding "arising in" a case under title 11.   *See* 28 U.S.C. § 157(b)(2)(G) and (N).

2.   Counts III and IV

Count III (Slander of Title) and Count IV (Defamation) of the Complaint do not constitute proceedings "arising under" or "arising in" a case under title 11 as those counts are not based on any right expressly created by title 11, and they would exist outside of the bankruptcy case.  They do not involve questions of bankruptcy law or require interpretation of the Sale Order and are based entirely on state law. Indeed, they also do not constitute "related to" proceedings as the outcome of those counts could have no conceivable effect on the Debtor's bankruptcy estate.  Accordingly, the Court finds it does not have subject matter jurisdiction over Counts III and IV of the Complaint and will dismiss those counts.

The Court, having determined that it has jurisdiction to adjudicate the issues raised only in Counts I and II of the Complaint, will address those counts in reverse order.

C.   <u>Count II (Violation of the Sale Order)</u>

The Bankruptcy Code contains no express contempt authority.  Section 105(a) of Title 11, however, in relevant part, provides:  "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. . . ." 11 U.S.C. § 105(a).  In <u>Bessette v. Avco Fin. Serv.</u>, 230 F.3d 439 (1st Cir. 2000), *cert. denied*, 532 U.S. 1048, 121 S. Ct. 2016 (2001), the United States Court of Appeals for the First Circuit ruled that 11 U.S.C. § 105 "provides a bankruptcy court with statutory contempt powers, in addition to whatever inherent contempt powers the court may have." <u>Id</u>. at 445.  Some bankruptcy courts have relied upon the court's inherent authority to find parties in

44

contempt to enforce orders.  *See* <u>In re El Comandante Mgmt. Co., LLC</u>, 358 B.R. 1 (Bankr.

D. P.R. 2006), in which the court stated:

> "'[I]nherent authority' 'means the authority' of a trial court, . . .  to control
> and direct the conduct of civil litigation without any express authorization
> in a constitution, statute, or written rule of court.  This authority, in other
> words, flows from the powers possessed by a court simply because it is a
> court; it is an authority that inheres in the very nature of a judicial body and
> requires no grant of power other than that which creates the court and gives
> it jurisdiction.'"

<u>Id</u>. at 11 n.5 (quoting 73 Tex. L. Rev. 1805).  Accordingly, this Court has the authority to

remedy violations of its orders and to enforce specific provisions of the Bankruptcy Code

through its contempt power, whether such power is inherent or conferred by 11 U.S.C. §

105.  <u>Kittywalk Sys., Inc. v. Midnight Pass Inc. (In re Midnight Pass Inc.)</u>, No. 09-14300-

JNF, A.P. No. 09–1179, 2009 WL 3583957, at *12 (Bankr. D. Mass. Oct. 30, 2009). *See also*

Fed. R. Bankr. P. 9020 and 9014 (contempt motions are governed by Rule 9014 which, in

turn, governs contested matters).

The Bankruptcy Appellate Panel for the First Circuit in <u>Duby v. United States of</u>

<u>Am. (In re Duby)</u>, 451 B.R. 664 (B.A.P. 1st Cir. 2011), *aff'd*, No. 11-9006, 2012 WL 12552111

(1st Cir. Apr. 17, 2012) discussed the two types of sanctions available for contempt.  It

observed:

> Courts have recognized two types of sanctions. Civil contempt sanctions
> are designed to coerce the contemnor into compliance with a court order or
> to compensate a harmed party for losses sustained. *See* <u>United States v.</u>
> <u>United Mine Workers of Am</u>., 330 U.S. 258, 303–304, 67 S. Ct. 677, 91 L. Ed.
> 884 (1947); <u>Gompers v. Buck's Stove & Range Co</u>., 221 U.S. 418, 442, 31 S.
> Ct. 492, 55 L. Ed. 797 (1911); <u>Ingalls v. Thompson (In re Bradley)</u>, 588 F.3d
> 254 (5th Cir. 2009); <u>Eck v. Dodge Chemical Co. (In re Power Recovery Sys.,</u>
> <u>Inc.)</u>, 950 F.2d 798 (1st Cir. 1991). In contrast, criminal contempt sanctions
> are punitive in nature and are imposed for the purpose of vindicating the

authority of the court. *See* Id. Where a contempt sanction is not compensatory, it is civil, and therefore non-punitive, only if the contemnor is afforded some opportunity to purge the contempt. *See* Int'l Union v. Bagwell, 512 U.S. 821, 829, 114 S. Ct. 2552, 129 L. Ed.2d 642 (1994); Penfield Co. of Cal. v. SEC, 330 U.S. 585, 590, 67 S. Ct. 918, 91 L. Ed. 1117 (1947).

In re Duby at 670.

As this Court discussed at length in Midnight Pass, criminal contempt is a "crime in the ordinary sense," and the exercise of judicial power to punish for criminal contempt is subject to the procedural safeguards that protect the criminally accused, including proof beyond a reasonable doubt, and all the protections afforded to those accused of a crime. Midnight Pass, 2009 WL 3583957 at *12 (citing Bloom v. Illinois, 391 U.S. 194, 201, 88 S. Ct. 1477 (1968); Sosne v. Reinert & Duree, P.C. (In re Just Brakes Corp. Sys., Inc.), 108 F.3d 881, 885 (8th Cir. 1997), *cert. denied*, 118 S. Ct. 364 (1997); Eck v. Dodge Chem. Co. (In re Power Recovery Sys.), 950 F.2d 798, 802 n.18 (1st Cir. 1991) (citing Fed. R. Crim. P. 42(b)). The authority of a bankruptcy court to impose punitive damages under its civil contempt powers, rather than pursuant to a specific Bankruptcy Code provision expressly empowering a court to impose fines and punitive damages, such as § 362(k), has been the subject of much debate and is unsettled. *Compare* Jove Eng'g, Inc. v. I.R.S. (In re Jove Eng'g, Inc.), 92 F.3d 1539, 1554 (11th Cir. 1996) (stating "the plain meaning of § 105(a) encompasses *any* type of order, whether injunctive, compensative or punitive, as long as it is 'necessary or appropriate to carry out the provisions of' the Bankruptcy Code."), *with* Knupfer v. Lindblade (In re Dyer), 322 F.3d 1178, 1193 (9th Cir. 2003) ("[C]riminal contempt sanctions are not available under § 105(a) . . . The sanctions associated with civil contempt--that is, compensatory damages, attorney fees, and the

offending creditor's compliance--adequately meet [the] goal [of § 105] ... rendering serious punitive sanctions unnecessary.") (citing Walls v. Wells Fargo Bank, N.A., 276 F.3d 502, 507 (9th Cir. 2002)). In Bessette, *supra*, the United States Court of Appeals for the First Circuit recognized that the contempt power of the bankruptcy court extends to awards of punitive damages, however, that decision was in the context of a violation of the statutorily imposed discharge injunction under 11 U.S.C. § 524, which is not at issue in this case.[14]

As the issue appears to be unresolved in this Circuit, this Court will limit itself, with respect Count II, to consideration of sanctions which are employed in civil contempt proceedings, namely those used "to coerce the defendant into compliance with the court's order or, where appropriate, to compensate the harmed party for losses sustained." Eck, 950 F.2d at 802 (footnotes omitted)). Where damages awarded serve a compensatory purpose, compensation should be for the actual damages incurred, and may include "attorneys' fees; litigation costs; travel expenses; other actual losses, such as wages or business income; and possibly emotional distress damages." In re Covelli, 550 B.R. 256,

---

[14] Recently, the United States Court of Appeals for the First Circuit in Charbono v. Sumski (In re Charbono), 790 F.3d 80, 85-87 (1st Cir. 2015) ruled that the bankruptcy court has inherent power to impose "punitive non-contempt sanctions" for failure to comply with its orders, and it upheld an award of a sanction of $100 imposed upon a debtor for failing to deliver a copy of his request for extension of the filing deadline for his federal income tax return to the trustee within the time allowed under the terms of a confirmed Chapter 13 plan. As neither party cited Charbono, which is factually distinguishable from this proceeding, and Heaney framed Count II as a request for an order of contempt at the trial, *see* Tr. at 216, the Court will not consider Count II as a request for this Court to impose punitive non-contempt sanctions against Lamento.

269 (Bankr. S.D. N.Y. 2016) (quoting In re Haemmerle, 529 B.R. 17, 26 (Bankr. E.D. N.Y. 2015)).

A party alleging civil contempt must establish by clear and convincing evidence that a contemnor violated a court order, AccuSoft Corp. v. Palo, 237 F.3d 31, 47 (1st Cir. 2001) (citation omitted), and substantial compliance can avert a finding of contempt. Langton v. Johnston, 928 F.2d 1206, 1220 (1st Cir. 1991). "[C]ivil contempt will lie only if the putative contemnor has violated an order that is clear and unambiguous[,]" Project B.A.S.I.C. v. Kemp, 947 F.2d 11, 16 (1st Cir. 1991), and it is sufficient that the court order violated be "specific and definite" and that the offending party had knowledge of the court's order. Slaiby v. Rassman (In re Slaiby), 73 B.R. 442, 444 (Bankr. D. N.H. 1987) (quoting Fidelity Mortg. Investors v. Camelia Builders, Inc., 550 F.2d 47, 51 (2d Cir. 1976) (citations omitted), *cert. denied*, 429 U.S. 1093 (1976)).

There is no dispute that Lamento was aware of the Sale Order as he participated in the sale process and, indeed, acknowledged at trial that he reviewed the order shortly after its issuance. Moreover, he timely filed the BAP Appeal and the Motion for Reconsideration with respect to the Sale Order. The Sale Order clearly and unambiguously barred and enjoined persons who held interests in or against the property, such as Lamento, from asserting those interests against the property and Heaney. The Sale Order was submitted to the Court by the Debtor following the Sale Hearing, at a time when Lamento had already padlocked the property, exchanged contentious e-mails with public officials and brokers about the extent of his property rights, and objected to the Sale Motion. The Sale Order included specific and definite

48

injunctive provisions to prevent the very type of situation which unfolded here.  Lamento does not assert that the Sale Order was unclear or ambiguous, rather, he contends that it was unlawful and that his ability to foreclose the right of redemption survived the Sale, arguments which fail due to the finality of the Sale Order.

The clear, convincing, and unrebutted evidence produced at trial establishes that Lamento failed to substantially comply with the injunctive provisions of the Sale Order. On the contrary, he overtly and intentionally violated them by continuing to assert his "interest" in the property after the Sale by filing the Land Court Action, attacking Heaney on social media platforms, and jeopardizing the Project by publicly calling into question the status of Heaney's title to the property and alerting the Projects' funding source of his allegations of fraud.  His litigation tactics, internet postings and communications with the Project's principals were willful, demonstrating bad faith and a complete disregard of the Sale Order, the authority of this Court, and the judicial process.  Moreover, his aggressive conduct and recalcitrance continued during the trial where his campaign to assert his previously adjudicated rights in the property and impugn those who became involved in the property's development and improvement brazenly continued.

Lamento's asserted defense that Mass. Gen. Laws ch. 60, § 65 (the filing of a petition for foreclosure of the right of redemption may be filed in Land Court after six months from the taking) permitted him to file the Land Court Action ignores the validity and finality of the Sale Order and the realities of the consummated Sale following which the Debtor no longer had a right of redemption in the property to foreclose.  To the extent Lamento asserts a defense to Count II based on the allegation that Heaney committed

perjury at trial when he testified that he had never met Carey, such a defense is

unsupported and unfounded.   The Court finds that Heaney was a credible witness.

Whether or not he and Carey ever met is wholly immaterial to the dispute here, and

Lamento's allegations to the contrary are but further examples of his unsubstantiated

claims of fraud and collusion in connection with the Sale which the Court has previously

rejected.  For all of the above reasons, the Court finds that Lamento willfully violated and

is in contempt of the Sale Order.

The Court also finds that Heaney established, without rebuttal, that he sustained

actual losses as a result of Lamento's contempt of the Sale Order in the form of attorney's

fees paid to date in connection with the Land Court Action, the appeal to the

Massachusetts Appeals Court, and the BAP Appeal ($14,000), as well as for title work

performed by Attorney Kevin Hart ($2,500).  At trial, he testified that he incurred actual

losses for carrying costs from October of 2016 through March of 2017, resulting from the

delay in the closing of the sale to the Arts Council caused by Lamento's internet postings

and e-mail communications with Grace.   Those costs included sums paid for taxes,

insurance, fire alarm monitoring, utilities, loss of return on investment, and property

maintenance.  Although Heaney testified at trial that these costs totaled approximately

$36,000, he estimated that sum to be approximately $26,000 in his post-trial brief.  The

Court will use this lower figure of $26,000 for the damages incurred. Lastly, Heaney

credibly testified that he suffered emotional distress as a result of Lamento's public and

vindictive comments and actions, including worry and stress about his personal and

business reputation, and over his concerns about his daughters' fears that he was going

50

to be arrested. The anguish he experienced was evident from his demeanor at trial. Although Heaney did not quantify the amount of his emotional distress damages, the Court finds that $7,500 is a reasonable figure and in proportion to the seriousness of Lamento's offenses. *See generally* <u>Fleet Mortg. Grp., Inc. v. Kaneb</u>, 196 F.3d 265, 269-270 (1st Cir. 1999).  Lamento had the opportunity to cross examine Heaney on this matter and/or present his own witnesses to rebut this evidence, and he failed to do so.

The Court awards no damages to Heaney for loss of business income or profit, or loss of business opportunity relating to his unaccepted bid to renovate the Worcester County Courthouse.  The testimony of Appleton and Heaney about the reasons for the failure to win approval of Heaney's bid was speculative and uncorroborated by public officials involved in the bid approval process and does not constitute competent evidence of an actual loss sustained by Heaney.

The Court allows Heaney's request in Count II of the Complaint to award him reasonable attorney's fees and costs incurred in prosecuting this adversary proceeding as further compensatory damages.  He shall submit to the Court for its review an itemization of his legal fees and expenses in the format required under MLBR 2016-1.  Following the Court's review of Heaney's submission, it will order Lamento to reimburse Heaney for the reasonable amount of attorney's fees and costs incurred by him in connection with this proceeding, in addition to the amount of compensatory damages set forth above, namely $50,000.  The Court denies Heaney's request set forth in Count II of the Complaint for punitive damages relating to Lamento's contempt of the Sale Order for the reasons stated above.

Given Lamento's demonstrated unwillingness to comply with past orders of this Court and to prevent further abuses by him, the Court grants Heaney's request in Count II of the Complaint to enjoin Lamento from any further conduct seeking to assert an interest in the property.  The Court shall enter judgment in favor of Heaney and against Lamento on Count II of the Complaint consistent with the above rulings.

   D.  Count I (Willful Violation of the Automatic Stay)

The commencement of the Debtor's bankruptcy case triggered the automatic stay provisions of 11 U.S.C. § 362(a), which provide, in relevant part, the following:

> (a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, . . . , operates as a stay, applicable to all entities, of-- . . .
>
> (1) the commencement or continuation, including . . . a judicial. . .  action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title; . . .
>
> (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;
>
> (4) any act to create, perfect, or enforce any lien against property of the estate; . . .
>
> (6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title; . . .

11 U.S.C. § 362(a)(1), (3), (4) and (6).

In Count I of his Complaint, Heaney alleges that Lamento violated the provisions of § 362(a)(1), (3) and (4) when he filed the Land Court Action and appealed its dismissal without seeking relief from the stay.  In his post-trial brief, he relies on § 362(a)(1) and

(6).[15]  The Court finds that § 362(a)(3) and (4), which relate primarily to actions concerning property of the estate, are inapplicable here because the property was no longer property of the estate on the date Lamento commenced the Land Court action (November 23, 2015) as a result of the Sale to Heaney. *See* § 362(c)(1) ("... the stay of an act against property of the estate under subsection (a) of this section continues until such property is no longer property of the estate[.]"); <u>In re Parrish</u> 171 B.R. 138, 140 n.2 (Bankr. M.D. Fla. 1994) ("Once . . . property is sold and is no longer property of the estate, the stay ceases."). Although the proceeds of the Sale constituted property of the estate on the date Lamento commenced the Land Court Action, there is no indication in the record that Lamento commenced that action to obtain possession of, exercise control over, or create, perfect, or enforce a lien with respect to the sale proceeds.  Accordingly, the Court will confine its inquiry into whether Lamento violated § 362(a)(1) and/or (6).

Heaney's claim against Lamento for violation of the automatic stay is based on Lamento's prosecution of the Land Court Action, and the subsequent appeal, without seeking relief from the stay.  This Court can find no violation of the stay under § 362(a)(1) or (6) based on the filing of the Land Court Action.  While the filing of the Land Court Action constituted "the commencement . . . of a judicial … proceeding against the debtor," it could not have been commenced by Lamento until after the petition date. *See*

---

[15] Heaney also makes brief mention therein that Lamento violated the stay under § 362(a)(3) by "exercising control over property of the estate" when he padlocked the property from June of 2015 through October of 2015.  These events occurred before Heaney purchased the property and are too remote to confer standing on Heaney or to form the basis for a claim under Count I of the Complaint.

Mass. Gen. Laws ch. 60, § 65. Moreover, the Land Court Action was not commenced "to recover a claim against the debtor," nor was it an action to "collect, assess, or recover a claim against the debtor." A claim is a "right to payment" or a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured." 11 U.S.C. § 101(5)(A) and (B). Lamento filed the Land Court Action to foreclose the Debtor's right of redemption to confer title to the property in himself. He was not seeking a right to payment but, rather, a right to the equitable remedy of foreclosure. This remedy, however, was dependent upon and derivative of the Debtor's rights in the property. The Debtor, and, thus, the bankruptcy estate, ceased to have an interest in the property after November 12, 2015, when the Sale Order became final, more than a week before Lamento commenced the Land Court Action. Lamento's "right" to the equitable remedy of foreclosure of the right of redemption was not "fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured" but had been extinguished by the Sale.

The Debtor was essentially a nominal defendant in the Land Court Action which was a legal nullity when filed. "Th[e] respite [afforded by the automatic stay] enables debtors to resolve their debts in a more orderly fashion, . . . , and at the same time safeguards their creditors by preventing 'different creditors from bringing different proceedings in different courts, thereby setting in motion a free-for-all in which opposing interests maneuver to capture the lion's share of the debtor's assets.'" Soares v. Brockton Credit Union (In re Soares), 107 F.3d 969, 975 (1st Cir. 1997) (citations omitted). The filing

of the Land Court action did not imperil the Debtor, property of the estate, nor the rights or interest of creditors.  This is not to say that Heaney was unharmed by the filing of the Land Court Action; the trial record abundantly supports the conclusion that he was. Those damages, however, are rightfully redressed through Count II of the Complaint, not through a claim for violation of the automatic stay.

For the above stated reasons, the Court finds that the filing of the Land Court Action and the related litigation and appeal do not fall within the proscription of the automatic stay.  Having reached this conclusion, the Court need not address Lamento's reliance on <u>229 Main St. Ltd. P'ship v. Massachusetts Dep't of Envtl. Prot. (In re 229 Main St. Ltd. P'ship)</u>, 262 F.3d 1 (1st Cir. 2001), or <u>In re Tomaselli</u>, No. 14-10736-JNF, 2014 WL 4322404 (Bankr. D. Mass. Aug. 29, 2014) which are, in any event, inapposite to the legal issues in dispute here. While Heaney generally argues that "if the economic harm suffered by a buyer at a § 363 sale is not remedial under § 363(k), then the teeth of § 363 are eviscerated," the Court finds that his remedy lies in Count II of the Complaint based on contempt of the Sale Order.

For the above stated reasons, the Court finds that Lamento did not violate the automatic stay when he filed the Land Court Action and the related appeal. The Court shall enter judgment in favor of Lamento and against Heaney on Count I of the Complaint consistent with the above rulings.

## VI. CONCLUSION

For the reasons stated above, the Court shall issue a judgment in favor of Lamento and against Heaney on Count I of the Complaint and a judgment in favor of Heaney and

against Lamento on Count II of the Complaint.  The judgment in favor of Heaney on Count II shall be not be final at this time as the Court must determine Heaney's reasonable legal fees and costs associated with the filing and prosecution of this adversary proceeding.  Heaney shall, within 21 days, file an itemization of his legal fees and expenses in the format required under MLBR 2016-1.  Thereafter, the Court will add the amount of Heaney's reasonable attorney's fees and costs in connection with this adversary proceeding to the amount of compensatory damages set forth above ($50,000) to determine the final judgment to be awarded to him under Count II of the Complaint. The Court denies Lamento's request for attorney's fees as set forth in his Answer.  The Court shall also enter a permanent injunction against Lamento, enjoining him from any further conduct seeking to assert an interest in the property.

The Court dismisses Count III (Slander of Title) and Count IV (Defamation) of the Complaint for lack of subject matter jurisdiction, as such counts do not constitute proceedings "arising under," "arising in," or "related to" a case under title 11. *See* 28 U.S.C. § 1334.  Such dismissal is without prejudice to Heaney's rights to assert such claims against Lamento in a court of competent jurisdiction.

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated: November 17, 2017